1  GREENBERG TRAURIG, LLP
2  IAN BALLON (SBN 141819)
   WENDY MANTELL (SBN 225544)
3  LORI CHANG (SBN 228142)
   2450 Colorado Avenue, Suite 400E
4  Santa Monica, California 90404
   Telephone: (310) 586-7700
5  Facsimile: (310) 586-7800
6
   Attorneys for Defendants
7  Rapidshare AG, Christian Schmid and Bobby Chang
8
9              UNITED STATES DISTRICT COURT
10
             SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| 12 PERFECT 10, INC., a California corporation | CASE NO. 09 CV 2596 H (WMC) |
| 13 | **EXPERT DECLARATION OF** |
| 14 Plaintiff, | **FREDERICK S. LANE IN SUPPORT OF DEFENDANTS' OPPOSITION** |
| 15 vs. | **TO MOTION FOR PRELIMINARY INJUNCTION** |
| 16 | |
| 17 RAPIDSHARE A.G., a corporation, CHRISTIAN SCHMID; BOBBY | DATE: May 12, 2010 |
| 18 CHANG; and DOES 1 through 100, inclusive | TIME: 1:30 p.m. CTRM: 13 |
| 19 | JUDGE: Marilyn L. Huff |
| 20 Defendants. | DATE FILED: November 18, 2009 |
| 21 | TRIAL DATE: None Set |

22
23
24
25
26
27
28

## DECLARATION OF FREDERICK S. LANE

I, Frederick S. Lane, do hereby declare as follows:

1.      I make this declaration in support of the Opposition to Plaintiff Perfect 10's Motion for Preliminary Injunction filed by Defendant RapidShare A.G. Except where otherwise stated, I have direct and personal knowledge of the facts set forth herein and, if called as a witness, can and will competently testify thereto.

**A.      Educational and Professional Background**

2.      I received a Bachelor of Arts degree in May, 1985 from Amherst College in the fields of American Studies (*magna cum laude*) and Classics (*cum laude*). In May, 1988, I graduated from Boston College School of Law with a Juris Doctorate degree (*cum laude*).

3.      Following graduation from law school, I clerked for two years for the Honorable Frank H. Freedman, former Chief Judge, United States District Court (D. Mass.) (since deceased). In October 1990, I moved to Burlington, Vermont, where I worked in private practice for approximately four and a half years.

4.      In February 1995, I began a computer consulting firm for the legal profession. A short time later, I began researching my first book, *Obscene Profits: The Entrepreneurs of Pornography in the Cyber Age* (Routledge 2000).

5.      I have since written five books, the most recent of which is *American Privacy: The 400-Year History of Our Most Contested Right* (Beacon Press 2010).

6.      In addition to my professional work, I currently serve as Chair of the Burlington School Board and serve as a member of the Vermont Community Access Media Board of Directors.

7.      Additional information about my professional activities is set forth in my *c.v.* A true and correct copy of my *c.v.* is attached as Exhibit A.

///

///

///

## B. Development of Relevant Expertise

8.      I have been working with computers in various capacities since 1974. I purchased my first personal computer, an IBM PC, in the fall of 1984 and have used a series of personal desktop and laptop computers continuously since that time.

9.      I began using computer bulletin boards in the late 1980's, and first began using the Internet in late 1993 or early 1994, prior to the release by Marc Andreeson of Mosaic 1.0 (the first graphical Web browser).

10.      I have been a consistent user of the Internet since that time and have lectured frequently on the practical and legal issues that the Internet raises for the legal profession, college and high school students, civic groups, and parents. My first seminar devoted specifically to the Internet for lawyers was presented at a meeting of the Vermont Bar Association in January 1995. Since that time, I have presented dozens of seminars on a wide variety of computer-related topics, including electronic discovery, the Y2K bug, online pornography and obscenity, computer forensics, and social networking.

11.      My specific interest in the online adult industry was sparked by the passage of the Communications Decency Act ("CDA"), which Congress incorporated into the Telecommunications Act of 1996. The provisions of the CDA caused a tremendous outcry in various sectors of the Web and became one of the first Internet-related issues to catch the attention of the mainstream media.

12.      As someone with a particular interest in First Amendment, free speech, and computer-related issues, I closely followed the debate over the CDA and the subsequent legal proceedings before the U.S. District Court in Philadelphia and the United States Supreme Court.

13.      Following the U.S. Supreme Court's unanimous rejection of the indecency provisions of the CDA in *Reno v. ACLU*, 521 U.S. 844 (1997), I put together a book proposal to examine the pornography industry's successful adoption of the Internet. The proposal was accepted by Routledge and my book, *Obscene Profits: The Entrepreneurs of Pornography in the Cyber Age,* was published in January 2000.

14.     I began researching and writing *Obscene Profits* in January 1998. Over the following two years, I spent approximately 3,000 hours researching the pornography industry in general and online adult businesses in particular. My work included: traditional research, including the review of previously published books and articles; interviews with various individuals working in, for, and against the pornography industry; extensive online research of sexually explicit web sites; examination of various business models; review of legal decisions and on-going prosecutions from around the country; and extensive drafting and redrafting of the manuscript itself.

15.     *Obscene Profits* is divided into two halves: the first half is a historical discussion of pornography, concentrating on the way that various technologies have quickly been used to produce sexually explicit materials; the second half is more economic in focus, consisting of an examination of different types of adult businesses and the ways in which they adapted their business practices to the Internet.

16.     Following the publication of *Obscene Profits*, I have been interviewed as an expert on the pornography industry, online adult businesses, and American cultural battles by numerous media outlets, including newspapers, radio, and television. A representative sample of interviews is included in my attached *c.v.*

17.     For the past decade, I have also worked as an expert witness and/or consultant in a variety of cases involving pornography, obscenity, and/or the pornography industry. These matters have included criminal prosecutions for obscenity and child pornography, constitutional challenges to local and federal statutes, and civil actions between adult businesses. Past clients include the U.S. Department of Justice; the City of Charlotte, North Carolina; the University of Vermont; and numerous private individual and corporate defendants.

18.     Following the publication of *Obscene Profits*, I have continued to research and educate myself about the pornography industry in general and online adult businesses in particular.

19.     By the time I finished *Obscene Profits*, I had compiled a database of roughly 3,000 articles, interviews, statutes, legal decisions, legislation, movie reviews, book summaries, and other sources of information about pornography and obscenity. Over the ensuing decade, my personal archive has grown to more than 15,000 articles, the bulk of which deal with some aspect of the adult industry. I routinely refer to the contents of that database when providing consulting and expert services, researching book ideas, writing articles, or preparing lectures.

20.     Since the publication of *Obscene Profits*, I have maintained subscriptions to and regularly read the online adult industry's two leading trade publications, *Adult Video News* and *Xbiz*. I have contributed articles to both publications at various times over the years, although the contraction of online adult revenues (discussed in more detail below) has reduced the number of freelance articles they purchase.

**C.     Work Performed in Support of This Declaration**

21.     Prior to being hired as an expert witness for RapidShare A.G., I was familiar, to varying degrees, with the two main parties to this litigation. On or about February 12, 2002, I was hired as an expert witness for defendant Cybernet Ventures, Inc. ("Cybernet") in a copyright infringement lawsuit filed by Perfect 10. At the time, Cybernet owned and operated Adult Check, an adult verification service (AVS). As an expert for Cybernet, I was provided with and reviewed a variety of pleadings, declarations, and materials related to the operation of Perfect 10 and the company's lawsuit against Cybernet.

22.     As part of my research for *Obscene Profits*, I had learned of the existence of *Perfect 10* magazine during the debate over the Military Honor and Decency Act, when Congress elected to bar certain magazines from commissaries and other military stores. *Perfect 10*, like *Playboy*, was one of a small number of adult magazines permitted to remain on sale.

23.     I am familiar with RapidShare from my general familiarity with file-sharing services as part of my computer forensics research.

24. Following my retention as an expert witness in the current litigation, I was provided with and reviewed a variety of materials. In preparation for making this declaration, I have reviewed the following documents:

    a. The Perfect 10 Memorandum in Support of its motion for preliminary injunction;

    b. The Declaration of Dr. Norman Zada, including attachments;

    c. The Declaration of Melanie Poblete, including attachments;

    d. The Declaration of Lutz Pfaff, including attachments;

    e. Assorted research materials related to the parties and issues in this case.

25. In addition, I have spent time reviewing the Web sites of the two main parties to this litigation, and have conducted searches similar to those referenced by Dr. Norman Zada in his declaration. I have also conducted independent research into the various issues raised by the documents and pleadings in this case.

26. Lastly, I have relied on the research that I have done over the last 12 years, including the informational database that I have compiled in the process.

**D. A Brief History of the Online Adult Industry**

27. Today's online adult industry can be traced to two unrelated developments in the early 1980s. First, a number of bulletin board systems around the United States generated sizeable revenues by offering subscribers access to adult stories and scanned pornographic images. Second, in Geneva, Switzerland, a researcher named Timothy Berners-Lee wrote a memo in 1984 proposing a new system for linking together electronic resources stored in various computer servers at CERN, the Swiss nuclear research facility.

28. Berners-Lee's information system, which he dubbed the World Wide Web, remained largely the province of researchers and scientists until the release in 1993 of Mosaic, the first graphical Web browser. The new tool for accessing information online

set off a period of phenomenal growth for the Internet, with new users joining at a rate of several thousand percent per year.

29. More than any other industry, the pornography industry saw the potential of the new information medium. A decade earlier, pornography businesses had profited enormously from a similar paradigm shift, when the videocassette recorder became a staple of the American home. The transition from film to video taught the adult industry two valuable lessons: First, that new technology is an opportunity to repackage and repurpose existing content; and second, that consumers will pay a premium for easier and more private access to sexually explicit materials. Just as videos were an easier and more private alternative to adult movie theaters, Web sites were an easier and more private alternative to adult video stores.

30. The adult industry was so successful in adapting to the new medium that by the middle of 1995, there was growing concern about the amount of pornography online. Fears were exacerbated by a *Time* magazine cover story entitled "On a Screen Near You: Cyberporn." Written by Philip Elmer-DeWitt, the story cited a provocative (and erroneous) statistic that 83.5% of all Internet images were pornographic.

31. Although Elmer-DeWitt later conceded that he relied on a flawed study, his story helped provide impetus in Congress to the passage of the Communications Decency Act (CDA). Although aimed at the burgeoning online adult industry, the law was opposed by a broad swath of businesses and organizations on the grounds that a prohibition against the transmission of "indecency" would subject them to criminal liability.

32. The U.S. Supreme Court's 1997 unanimous rejection of the indecency provisions of the CDA in *Reno v. ACLU* gave a tremendous psychological boost to the online adult industry. Although the Court upheld the application of existing obscenity standards to the Internet, it described the free speech value of the new medium in such sweeping terms that it was clear that it would be difficult, if not impossible, for Congress

to impose significant limitations on the distribution of sexually explicit content on the Internet.

33.     The three-to-four year period after the Court's decision in *Reno v. ACLU* is colloquially known as "the golden years" for the online adult industry. The novelty of the new medium, the staggering array of content available, and the convenience of accessing sexually explicit materials in the comfort of one's home meant that enterprising Webmasters could charge $20, $30, or even $40 per month for access to an adult Web site.

34.     The online adult industry's confidence was not shaken by subsequent efforts by Congress to limit the spread of Internet pornography. In 1998, Congress passed the Child Online Protection Act (COPA), which imposed a requirement on Web sites to block access by minors to content deemed "harmful to minors." The law was instantly challenged, however, and in a long series of court decisions, repeatedly held to be unconstitutional. The single Internet content law to survive scrutiny is the Children's Internet Protection Act (CIPA), a 2000 law which among other things requires libraries and schools to install software filters as a condition of receiving "E-rate" funds.

35.     The online adult industry's biggest challenges proved to be economic, not legal. In 2000, MasterCard and Visa announced aggressive programs to cut down on the number of "chargebacks," the term for refund requests from consumers dissatisfied with an online purchase or who alleged that their card had been stolen and misused (a frequent explanation to disgruntled spouses). Not surprisingly, the adult industry had a much higher percentage of chargebacks than other online merchants – so much so, in fact, that American Express stopped processing credit purchase for online adult businesses altogether that same year. The credit card company campaigns against chargebacks marked the beginning of the end of the online adult industry's "golden era."

36.     A more significant factor emerged at about the same time: the development of adult affiliate programs. Savvy adult Webmasters realized that they could increase their subscription revenues by providing free content to a large number of feeder sites,

which would use the licensed, non-infringing content to attract Internet traffic and direct it back to the subscription sites. Some subscription sites paid a small fee for all traffic, others paid their affiliates a percentage of subscriptions generated by their affiliate sites, and still others offered some combination of the two. Much of the free content was dumped onto structurally simple adult Web sites known as thumbnail gallery posts (TGPs), where Web surfers could view hundreds or thousands of images, video clips, and links to adult Web sites.

37.     As the amount of free content spread, it had the predictable effect of driving down subscription rates to adult Web sites. As early as March 2001, *Wired* magazine was reporting that the online adult industry was suffering from a "glut of smut."

**E.     Over the Past 15 Years, Consumer Demand for Adult Materials Has Shifted**

38.     When the online adult industry first started in the mid-1990s, the idea of accessing adult materials in the privacy of one's home was sufficiently novel that early Web sites were little more than analogues of print magazines. Put another way, the content available on early adult Web sites was not significantly more explicit than the content available on newsstands or through the mail. Consumers were willing to pay adult Web sites a premium for the greater convenience and privacy, even though the content was not remarkably different.

39.     The type of content available online began to change in the late 1990s, in part due to the greater sense of confidence and freedom from prosecution heralded by the *Reno v. ACLU* case, and in part because of technological changes. As computers grew faster and Internet transmission speeds increased, adult Web masters expanded into more hardcore offerings, live chat, live sex shows, and streaming video (a technology the industry played an important role in developing and popularizing).

40.     Predictably, as more explicit material became available online, consumer demand for such materials increased. One metric for illustrating this point is the Alexa Internet traffic ratings. Three of the top 100 most-visited sites are **pornhub.com**, **xvideos.com**, and **youporn.com**. These "tube sites" (a nickname derived from their

similarity to the video-sharing site YouTube) feature video clips of hardcore sexual activity in a wide range of categories. Sites that feature softcore-only content typically rank much lower in the Alexa statistics. **Playboy.com**, for instance, has an Alexa traffic rank of 1,769 as of April 28, 2010, while **Danni.com** – one of the oldest softcore Web sites – has a rank of 7,099. By contrast, **Perfect10.com**, which only offers visitors softcore photos of its models, has an Alexa traffic rank of 288,990.

**F.     The Economic Structure of the Online Adult Industry Today**

41.     In its heyday – late 2000 to early 2001 – revenues for the online adult industry were estimated at between $4 and $4.5 billion per year. According to current estimates, the online adult industry takes in roughly half that amount today.

42.     The decline in online adult revenues is attributable to a number of different factors. First, the amount of free content available online has continued to grow at an astronomical rate. Faced with steadily falling revenues, the major subscription Web sites have made an increasingly urgent push for new paying customers by offering larger and larger amounts of free licensed content for affiliates to use to attract traffic. But since old content on the Internet rarely disappears, the supply of free, non-infringing pornography has become virtually limitless, paradoxically undercutting the need for anyone to pay for a subscription to an adult Web site.

43.     Second, with the advent of digital camera and video camera technology, it also became much easier for individuals and couples to post their own explicit content on amateur sharing sites, and surprisingly large numbers of people do so. Such content is either freely available on sharing sites that support themselves through advertising, or is available for a nominal fee.

44.     Third, the recent economic downturn has hit the online adult industry with surprising severity. Although the adult industry has traditionally been relatively recession-proof, the harshness of the current economic climate has increased consumer demand for free rather than paid content.

### G. Perfect 10's Business Models

45.     In his declaration in support of Perfect 10's motion for preliminary injunction, Dr. Norman Zada states that from 1997 through June 2007, his company published "the well-known magazine 'Perfect 10'" and that "[a]fter losing more than $50 million because of rampant infringement, Perfect 10 was forced to cease production of its flagship magazine in June 2007 and lay off key employees."

46.     Dr. Zada goes on to say that his company continues to operate **Perfect10.com**, where subscribers "may view more than 20,000 Perfect 10 Images as well as several videos."

47.     Overall, Dr. Zada states that his company's revenues have declined from $2,000,000 per year to less than $150,000. The implication is that the decline in his company's revenues has resulted from rampant theft of his intellectual property. However, a more reasonable explanation is that Perfect 10 has been affected by the market forces that have hit the adult industry as a whole and has failed to take steps to remain competitive in a dynamic industry with little margin for error.

#### 1.     *Perfect 10* Magazine

48.     From its inception, *Perfect 10* magazine was an exercise in nostalgia. Had it been founded in 1953 (when its obvious model, *Playboy*, was launched), it would have been bold and daring. But in 1997, despite its enormous global brand identity, even *Playboy* was having trouble maintaining a market for a softcore adult magazine. Its circulation had dropped from a high of over 7 million per month in the early 1970s to roughly 3 million in the late 1990s.

49.     Like other men's magazines, *Playboy* also faced growing competition from other sources of sexually explicit content: adult videos, cable television, and increasingly, the Internet. 1997 was an inauspicious time to start a determinedly softcore publication. According to the American Society of Magazine Editors, the number of men's magazines has dropped from 113 in 1997 to just 72 in 2009.

50.     Sharp rises in expenses, most notably paper and gasoline, have added to the adult magazine industry's woes. The newsstand price of the August 1997 *Playboy* was $4.95; in March 2010, the price was $6.99. The rising cost, particularly in comparison to the resources available online, is having a predictable effect on *Playboy's* subscription base. The company announced last October that it is reducing its rate base (which it uses to set advertising rates) to 1.5 million – a 42% reduction from the previous year's level.

51.     The economic challenges facing *Perfect 10* magazine were evident from the start. The magazine's first issue (contained in Exhibit 11 of Dr. Zada's declaration) consists of 112 pages. It had a cover price of $6.95, nearly $2 more than *Playboy*. The magazine consists almost entirely of model photos, and does not contain a single page of advertising, which suggests a challenging combination of high production costs and low revenues.

52.     By contrast, the August 1997 *Playboy* is 178 pages long and contains 26 pages of full-page ads from national brands, along with myriad smaller ads scattered throughout the magazine.

53.     Forty-three issues later, the cost of *Perfect 10* had risen to $7.99 per issue, but the level of internal advertising barely changed – just a single full-page ad by Chase-Durer, a watch manufacturing company. Interestingly, the contents of *Perfect 10*'s final issue are somewhat more explicit (both in terms of model poses and written content) than the magazine's earlier issues. Clearly, there was an editorial recognition that topless "Girl Next Door" photos were not competitive in the changing adult marketplace. However, the minimal editorial changes were not enough to overcome the economic pressures that ultimately drove the magazine out of business.

**2.     The Perfect 10 Web Site (www.perfect10.com)**

54.     The factors that prevented *Perfect 10* magazine from being an economic success are even more true with respect to the company's Web site, **perfect10.com**.

55.     Although the cost of distributing content on the Web is markedly lower than in print, that benefit is outweighed by the vastly greater competition that exists online.

Due to obscenity laws and local zoning regulations, the range of adult-oriented print material that can be sold is relatively limited. *Penthouse* and *Hustler* represent the outer boundaries of what can safely be sold in most mainstream retail outlets, which means that *Perfect 10* magazine faced a relatively small pool of competitors.

56.     Whereas *Perfect 10* magazine was competing with approximately 112 other men's magazines when it was founded, **perfect10.com** was competing from its inception with thousands and then tens of thousands of other subscription-based adult Web sites.

57.     In terms of both pricing and content, **perfect10.com** has failed to keep pace with its competitors. The site's monthly subscription fee, $25.50, is on the high end of the rates charged for adult sites (although not the highest). **Playboy.com**, for instance, charges $19.95 for a monthly membership to its Cyber Club, a rate that drops to $7.95 per month if paid annually. (**Perfect10.com** also offers a multi-month discount -- $16.58 for a six-month prepayment.) **Vivid.com**, one of the industry's largest producers of adult videos, charges $29.95 per month for access to more than 3,500 hours of high-definition video and over 400,000 photos. **ClubJenna.com**, the official site of the adult industry's most famous star, Jenna Jameson, charges $19.95 per month or $7.99 if billed annually. One of the better-known "amateur" sites, **wifeysworld.com**, also charges $19.95 per month. There are myriad adult Web sites that charge similar or lesser amounts, but there are very few that charge as much as or more than **perfect10.com**.

58.     The common characteristic of the examples cited (apart from **perfect10.com**) is the vast quantity of materials available to subscribers and the range of services offered. Virtually all of these sites offer subscribers hundreds of thousands of photographs and thousands of videos, many in high-definition. In addition, many of the sites charging less than **perfect10.com** now offer a variety of interactive features, ranging from live chat with models to user-controlled video.

59.     The offerings of the **perfect10.com** Web site – 20,000 photos and a handful of videos – are simply not competitive in the current adult marketplace. In order to justify the site's higher-than-usual monthly charge, the site would have to offer consumers

something that they could not get at other sites. Subscription sites typically distinguish themselves in terms of content – more hardcore, more fetish, more high-profile stars – or in terms of experience – video quality, interactive features, etc.

60. **Perfect10.com** does neither, offering a relatively limited catalog of PG- and R-rated photos of unknown models and less than a dozen short PG-rated videos that are essentially photo montages and model interviews. While there is a market for the material offered on the **perfect10.com** Web site – many Web sites advertise similarly "natural" models -- it is unquestionably a small one. **Perfect10.com**'s positioning of itself as the home of "natural" models is not sufficiently compelling to justify its higher subscription rates.

**H.    The Role of Copyright Infringement in Perfect 10's Financial Situation**

61. In terms of the ultimate impact on Perfect 10's business model, the lack of advertising revenues, high production costs, limited content offerings, and lack of competitive innovations are all far greater factors than the inevitable copyright violations suffered by an online adult content business.

62. Historically, Playboy has undoubtedly suffered more copyright infringement since the start of the personal computer era than any other adult business. In the mid-1980s, in fact, the newsgroup alt.binaries.erotica, which trafficked heavily in scanned *Playboy* photos, was described by one analyst as "gigabytes and gigabytes of copyright violations."

63. Since then, Playboy has succeeded in creating one of the most popular adult sites, thanks in large part to its strong brand, its innovative online offerings, and its aggressive anti-theft measures.

64. In 1997, at about the same time that *Perfect 10* magazine was launched, Playboy partnered with a digital watermarking firm called Digimarc (**www.digimarc.com**) to protect its images. The software has enabled Playboy to effectively track unauthorized uses of its images and substantially limit their redistribution. The success of the partnership can be measured in part by the fact that

there are very few news reports over the last decade involving efforts by Playboy to prevent misuse of its photos, and by the fact that a search of Google Images reveals a relatively small number of *Playboy* photos – far more common are shots of *Playboy* covers that are used for illustrative purposes. Interestingly, **playboy.com** allows subscribers to save copies of images from the site to their hard drive for their personal use (as does **perfect10.com**). But if a **playboy.com** image is subsequently reposted to the Web, it will be identified by Digimarc's "MarcSpider," a bot that scours the net for Playboy's content, and a report will be sent back to the company. The information by MarcSpider enable Playboy to quickly and easily send out DMCA-compliant takedown notices to offending Web sites.

65.     By contrast, a search for "perfect 10" on Google images turns up numerous content photos presumably scanned from *Perfect 10* magazine or copied from **perfect10.com**. Many of the images, in fact, still have the "Perfect 10" logo on them. The fact that these images are scattered across a wide variety of Web sites (unlike those of *Playboy*) suggests that Perfect 10 is not using similar digital watermarking technology to track its intellectual property and assist in issuing appropriate DMCA takedown notices.

66.     Over the last thirteen years, a number of other available technologies that are specifically designed to protect a copyright holder's rights in photographs and videos have been developed and are commercially available. For instance, PicScout (**www.picscout.com**) "enables clients to both protect and promote image usage across digital platforms and devices by using the company's proprietary and highly scalable image recognition fingerprinting technology." Similarly, Artistscope (**www.artistscope.com**) is a digital rights management solution that enables a copyright holder to "assign different permissions per user or group of users. When DRM rights are assigned the document becomes 'for their eyes only' and any copies of that document forwarded on cannot be viewed by others unless they also have rights of view."

67.     It appears that Perfect 10 invested enormous economic resources in producing content but comparatively little in protecting it from misuse. Although that

does not excuse infringement of the company's intellectual property, it raises legitimate questions about the seriousness of the company's efforts to compete in a challenging market.

**I.    Questions Regarding Evidence of RapidShare's Alleged Infringement**

68.    As part of his allegations against RapidShare, Dr. Zada has offered the results of various searches he has conducted online for Perfect 10 intellectual property.

69.    The results of Internet searches can be deceiving, as someone versed in mathematics and statistics should appreciate.

70.    For instance, a Google search conducted on April 28, 2010 for the terms "rapidshare 'perfect 10'" produced 56,400 results. The actual number of hits is far smaller than that number would indicate, for several reasons.

71.    First, a significant number of hits are news articles, blog postings, and other texts describing the current litigation, and have no links to infringing content.

72.    Second, many of the hits are from sites that use the phrase "perfect 10" in its colloquial meaning and not with reference to the plaintiff in this action. For instance, some sites are referencing content that happens to use the name "Perfect 10" without referencing the Plaintiff.

73.    Third, many sites have no infringing content or links to infringing content, but instead incorporate the search terms into metatags or hidden text in an effort to draw Internet traffic to unrelated material. Metatags are code words that are embedded in the HTML source code of a Web page to improve search results. "Hidden text" is an attempt to fool search engines by including numerous repetitions of a particular term in microscopic fonts or in a font color that matches the Web page background in the hopes that this will produce a higher search engine ranking. These techniques are particular common when there is a well-known or well-publicized controversy occurring, as in the present case. Misleading metatags and hidden text often are used to attract Web surfers to sites that have no connection to the terms in question, or are designed to infect the computers of such Web surfers with viruses or Trojan horses.

74.    Finally, Google's initial results page reports a number that often includes duplicate hits, thus reducing the actual tally. It is not possible to know the actual number of hits without going through to the final non-duplicative page of Google's search results. In my experience, the reported number of hits in a Google search is actually a much-inflated value over the actual number of hits.

**J.     RapidShare Is Not a Logical Competitor of Perfect10.com**

75.    In his declaration, Dr. Zada alleges that Perfect 10 "simply cannot compete with Rapidshare which sells access to billions of dollars of pirated full-length movies, songs, computer programs, and images (including Perfect 10's Images), for as little as $10 a month." However, this is a false comparison of two very different business models.

76.    RapidShare is not an adult website, and does not purport to be one. Its business model is built around the concept of making it easy for individuals to store and share files.

77.    Perfect 10's economic problems are a result of its lack of competitiveness within its own market sector. Indeed, Dr. Zada's statement could be more accurately rewritten to say "Perfect 10 simply cannot compete with **Playboy.com's** Cyber Club, which sells access to thousands of high quality images, an extensive collection of videos, and interactive features, at a price lower than **Perfect10.com** charges for its much smaller collection of material." For this comparison to be relevant, it is important to make sure that the properties being compared are actually in the same business. Perfect 10 and RapidShare are not.

I, Frederick S. Lane, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 28th day of April 2010, in Burlington, Vermont.

FREDERICK S. LANE

## __TABLE OF EXHIBITS__

Exhibit A        Frederick Lane Curriculum Vitae

# Exhibit A

# Frederick S. Lane

12 Catherine Street                                    FSLane3@gmail.com
Burlington, VT 05401                                www.FrederickLane.com
802-355-0158                              www.ComputerForensicsDigest.com

## Education

**Boston College Law School, Newton, MA**                          **May, 1988**
> Awarded a Juris Doctorate degree (*cum laude*).

**Amherst College, Amherst, MA**                                   **May, 1985**
> Awarded a Bachelor of Arts degree in American Studies (*magna cum laude*)
> and Classics (*cum laude*).

**Harry S. Truman Scholar (Massachusetts)**                        **May, 1983**
> A four-year national scholarship recognizing a commitment to a career in public service.

## Major Publications

*American Privacy: The Four-Hundred-Year History of Our Most Contested Right* (Boston,
> MA: Beacon Press, January 2010).

*The Court and the Cross: The Religious Right's Crusade to Reshape the Supreme Court*
> (Boston, MA: Beacon Press, June 2008).

*The Decency Wars: The Campaign to Cleanse American Culture* (Amherst, NY: Prometheus
> Books, 2006).

*The Naked Employee: How Technology Is Compromising Workplace Privacy* (New York,
> NY: Amacom, 2003).

*Obscene Profits: The Entrepreneurs of Pornography in the Cyber Age* (New York, NY:
> Routledge, 2000).

*Vermont Jury Instructions – Civil and Criminal* [with John Dinse and Richie Berger] (Salem,
> NH: Butterworth Legal Publishers, 1993).

Visit **http://www.fredericklane.com/index.php/professional-services/freelance-writing**
for an extensive list (with links) of freelance articles that I have written over the last decade.

## Employment History

**Computer Forensics Expert, Burlington, VT**                     **1999-present**
> Performed computer forensic examinations and provided technical consultative services to
> clients in a wide range of civil and criminal cases, ranging from intellectual property theft
> and zoning ordinance challenges to murder, obscenity, and child pornography. Trained in
> the use of the X-Ways Forensics software suite, as well as the operation and structure of
> computers, hard drives, and file systems. Extensive experience in the operation and file
> storage capabilities of personal computers, as well as the economics and business operations
> of the online adult industry.
>
> I am currently listed as a computer forensics expert with **The TASA Group**
> (www.tasanet.com), the **Vermont Criminal Defense Lawyers Association**, and the
> **Vermont and New York State Public Defenders Associations.**

**Author/Lecturer, Burlington, VT**                          **February 1995 - present**
>  Author of six books and numerous articles focusing on law, technology, privacy, obscenity, employee rights, and contemporary political issues. Organizer and presenter of dozens of seminars and lectures based on the topics covered in those books. Extensive media experience, including numerous on-camera interviews on all major networks and live interviews on dozens of national and local radio shows.

**Associate, Miller, Eggleston & Cramer, Burlington, VT**        **August 1993 - February 1995**
>  As associate attorney, assisted partners in handling all aspects of trial preparation and litigation. Primary practice area was business litigation, with additional work in the areas of corporate law and intellectual property.

**Associate, Dinse, Knapp & McAndrew, Burlington, VT**          **October 1990 - August 1993**
>  As associate attorney, assisted partners and senior associates in all aspects of litigation. Primary practice areas included insurance defense, medical malpractice, and intellectual property. In 1993, co-authored "Vermont Jury Instructions -- Civil and Criminal" with partners John Dinse and Richie Berger.

**Law Clerk, Hon. Frank H. Freedman, Chief Judge,**            **October 1988 - October 1990**
**United States District Court for the District of Massachusetts,**
**Springfield, MA**
>  Assisted Chief U.S. District Court Judge Frank Freedman in the research and drafting of federal trial court opinions. Also assisted in all aspects of federal trials, including jury selection, motion and evidentiary hearings, preparation of jury instructions, and post-trial motions.

## Recent Lectures and Seminars

**"Can You See Me Now? The Growing Problem of Sexting in the Public Schools,"** National School Board Association Annual Conference, McCormick Place-West Convention Center, Chicago, IL, April 11, 2010. Lecture on the rapidly-growing phenomenon of sexting among middle and high school students around the country.

**"Social Media: The Undiscovered Country,"** Vermont Bar Association Mid-Year Meeting, Burlington, VT, March 19, 2010. Panel discussion on various aspects of social media for attorneys, including First Amendment and computer forensic issues.

**"Living in a Wired World: Can Privacy Survive in the 21st Century?"**, Sun Valley Center for the Arts, Sun Valley, ID, March 10, 2010. Lecture and booksigning for *American Privacy: The Four-Hundred-Year History of Our Most Contested Right.*

**"Living in a Wired World: Can Privacy Survive in the 21st Century?"**, University of Vermont, Burlington, VT, November 18, 2009. Lecture on the impact of technology on student privacy and book-signing for *American Privacy: The Four-Hundred-Year History of Our Most Contested Right.*

**"A Knock at the Door: Three Centuries of Governmental Search and Seizure,"** Bostonian Society, Old State House Museum, Boston, MA, November 4, 2009. Moderated and participate in a panel discussion on writs of assistance and book-signing for *American Privacy: The Four-Hundred-Year History of Our Most Contested Right.*

**Digital Forensics Association**, Champlain College, Burlington, VT, October 21, 2009. Guest lecture on American Privacy and trends in student privacy.

**"American Privacy,"** Media Law and Ethics, St. Michael's College, October 15, 2009. Guest lecture on history of American privacy.

**Exhibit A**
**Page 18**

**"LimeWire Made Me Do It: And Other Digital Follies,"** 2009 Federal Criminal Defense Seminar, Office of the Federal Public Defender for the District of Vermont, Burlington, Vermont, October 9, 2009. Presented hour-long lecture on the technology of peer-to-peer software and related legal issues, including search and seizure, possession, and intent to distribute contraband.

**"Lost in MySpace,"** San Jacinto College, Pasadena, Texas, October 7, 2009. Presented lecture on student privacy in an increasingly wired and networked world.

**"American Privacy and the Recent Decision in** *United States v. Comprehensive Drug Testing, Inc.***,"** Essex Rotary Club, Essex, VT, September 2, 2009. Presented a brief lunchtime lec1ture on the topics covered by the forthcoming American Privacy and the connection to a recent significant 9th Circuit Court of Appeals privacy ruling.

**"Digital Dirt: Computer Forensics for Lawyers,"** Sheraton South Burlington, June 25, 2009. Organized and presented continuing legal education seminar for attorneys on developments in the field of computer forensics.

**The 2009 ADFSL Conference on Digital Forensics, Security and Law**, Champlain College, Burlington, VT, May 20, 2009. Presented keynote address on origins of metadata and its discussion in court opinions.

**Bill of Rights 101**, American Civil Liberties Union of Vermont, St. Albans, VT, May 18, 2009. Helped lead discussion groups for high school students on the interplay of technology and constitutional rights.

**"Can You See Me Now? The Growing Problem of 'Sexting',"** Burlington High School, April 29, 2009. Organized and led a panel discussion with Lt. Kris Carlson and Chittenden County States Attorney Thomas Donovan on the legal and social risks for students engaged in the practice of "sexting."

**"We Need to Talk: Three Years of Difficult Conversations about Race, Class, and Money,"** National School Board Association Annual Conference, San Diego, CA, April 6, 2009. Moderated and presented seminar on the efforts of the Burlington School District to achieve socio-economic integration in its elementary schools.

**Digital Forensics Association**, Champlain College, Burlington, VT, March 11, 2009. Guest lecture on *The Naked Employee* and trends in workplace privacy.

**American Studies 101**, St. Michael's College, March 2, 2008. Visiting lecture on the Warren Court and the 1960s Sexual Revolution.

**"From 'Norma Rae' and '9 to Five' to the Employee Free Choice Act in Today's Diverse Workplaces: 40 Years of Employment Law,"** The New Administration and New Congress: Guaranteed Changes for Labor and Employment Law, , Grand Hyatt Hotel, Washington, D.C., February 26, 2009. Participated in a panel discussion on labor law and employee rights sponsored by the Washington-based law firm Ogletree Deakins.

**"The Court and the Cross: The Religious Right's Crusade to Reshape the Supreme Court"** Author lectures and booksignings at the following locations:
- The Yale Club of New York City, New York, NY, February 5, 2009
- First Unitarian Universalist Society, Burlington, VT, September 14, 2008
- Burlington Book Festival, Burlington, VT, September 13, 2008
- Brownell Library, Essex Junction, VT, September 10, 2008
- Common Good Books, Minneapolis, MN, July 13, 2008

**"Data Aggregation: A Threat to Civil Liberties,"** American Civil Liberties Union of Vermont, The Inn at Willow Pond, Manchester, VT, June 26, 2008. Participated in a panel discussion about the privacy risks of data collection and data mining.

**"Civil Liberties,"** Norwich University (Northfield, VT), April 20, 2008. Visiting lecture on the

decency wars and civil liberties in the United States.

**"Whose Space?"**, American Civil Liberties Union of Vermont, Langdon Street Café, Montpelier, VT, April 17, 2008. Participated in panel discussion on the changing law and culture of privacy in the wired age.

**"Censorship,"** University of Vermont, April 8, 2008. Visiting lecture on decency and censorship in American society.

**"The Warren Court and the 1960s,"** American Studies 101, St. Michael's College, March 3, 2008. Visiting lecture on the Warren Court and the 1960s Sexual Revolution.

**"Efforts in Eliminating Human Trafficking,"** Zonta Club of Burlington, February 27, 2008. Lunchtime lecture on global trade in human trafficking and efforts to combat it.

**"Lost in MySpace: Privacy and Personal Safety in a Wired World,"** Dickinson College (Carlisle, PA), February 19, 2008. Featured speaker for program on student privacy online and on-campus.

**"Lost in MySpace: Privacy and Personal Safety in a Wired World,"** Elizabethtown College (Elizabethtown, PA), October 17, 2007. Featured speaker for program on student privacy online and on-campus.

**"YouTube: Legal/Social Impact of Emerging Technologies on Students,"** The Ohio Center for Law-Related Information (Columbus, OH), September 24, 2007. Featured speaker for program on student privacy online and on-campus.

**"Can Blogging Save Civil Liberties?"**, American Civil Liberties Union of Vermont, Isley Library, Middlebury, VT, September 17, 2007. Participated in panel discussion on the use of blogging to promote public discussion and civil liberties.

## Community and Public Service

**Burlington School Board, Burlington, VT**                    **October, 2002 - present**
    Elected as one of two Ward 5 representatives to the Board of School Commissioners. Duties include drafting District policies, overseeing operation of District administration, helping to develop and present District budget for annual Town Meeting day vote, and in general, representing the best interests of the city's children. Member of the Technology Subcommittee, October 2002 - March 2005; Chair of the Finance Subcommittee, April 2005 - March 2009; Clerk of the Board, April 2003 - March 2009; Board Chair, April 2009 - present.

**Vermont Community Access Media, Burlington, VT**                    **May, 2007 - present**
    Elected by local cable subscribers and media producers to serve as member of VCAM Board of Directors. Duties include drafting organization policies, overseeing and evaluating the VCAM Executive Director, reviewing VCAM expenditures, and advising VCAM staff on interaction with the public and area cable companies. Secretary of the Board, May 2007 - present.

**Ward Clerk, Ward 5, Burlington, VT,**                    **April, 1996 - October, 2002**
    Responsible for overseeing operation of neighborhood polling place during national, state, and local elections.

**Burlington Fire Commission, Burlington, VT,**                    **July, 1992 - June, 1998**
    Served as commissioner on community oversight board for the Burlington Fire Department. Vice-Chair, July 1995 - June 1998.